**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**IN RE COSI, INC. SECURITIES LITIGATION,**

This document relates to: ALL ACTIONS

_____

03 Civ. 812 (JGK)

OPINION & ORDER

**JOHN G. KOELTL, District Judge:**

The plaintiffs bring this alleged class action on behalf of all persons who purchased common stock of Cosi, Inc. ("Cosi") between November 21, 2002, and February 3, 2003 (the "class period").[1] The plaintiffs have sued Cosi, various officers and directors of Cosi (the "individual defendants"), and William Blair & Co, L.L.C. ("Blair"), the underwriter for the initial public offering of Cosi stock on November 21, 2002, (the "IPO") alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), 77o. The defendants now move to dismiss the Third Amended Complaint (the "TAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons explained below, the motions to dismiss are granted as to all claims against the defendants.

---

[1] No motion for class certification has been made.

1

I.

On a motion to dismiss, the allegations in the complaint are accepted as true. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiffs' favor. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v, Hassett, 886 F.2d 8, 11 (2d Cir. 1989); see also Marcus v. Frome, 329 F.Supp.2d 464, 468 (S.D.N.Y. 2004).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the defendants' motion to dismiss for failure to state a claim should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-14 (2002); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Grandon, 147 F.3d at 188; Goldman, 754 F.2d at 1065. In deciding the motion, the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which

2

judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Marcus, 329 F.Supp.2d at 468; VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F.Supp.2d 435, 437 (S.D.N.Y. 2001).

II.

The following allegations are contained in the TAC or the undisputed documents. Cosi, a Delaware corporation with its principle executive offices in New York, operates "fast casual" restaurants. (TAC ¶¶ 16, 36.) On February 25, 2002, Cosi announced plans to pursue an initial public offering. (Id. ¶ 37.) Cosi's preliminary IPO registration statement, filed with the Securities and Exchange Commission (the "SEC") on April 17, 2002, stated that it expected to earn $60 million in proceeds from the IPO, and to use the proceeds to fund a business expansion plan. (Id. ¶ 38.)

Cosi's prospectus issued pursuant to the IPO (the "Prospectus"), outlined, among other things, Cosi's business strategy, financial data, and planned use of the IPO proceeds. (Cosi Prospectus, dated Nov. 21, 2002 ("Prospectus"), attached at Ex. A to Declaration of Martin L. Seidel in Support of Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint, sworn to Oct. 12, 2004 ("Seidel Decl.").) Under the

heading "Concept and Business Strategy," the Prospectus stated: "Our objective is to build a nationwide system of distinctive restaurants that generate attractive unit economics by appealing to a broad range of customers . . . ." (Id. at 1.) The Prospectus also stated that,

> The addition of new restaurants has been our primary source of growth historically and we anticipate that it will be the primary source of growth in the near term. We believe that we have adopted a manageable growth strategy and intend to develop many of our new restaurants in existing markets, and selectively enter new markets, to gain operational efficiencies, enhance convenience for our customers and increase brand awareness.

(Id. at 2.)

The Prospectus stated that Cosi intended to use approximately $19.6 million of the proceeds from the IPO to finance the development of new restaurants and to maintain and remodel existing restaurants. (Id. at 15.) It stated that Cosi had opened seventeen new restaurants in 2001, and planned to open approximately twenty-five new restaurants during the 2002 fiscal year and fifty-three to fifty-nine new restaurants in the 2003 fiscal year. (Id. at 2, 22, 29, 36.) The Prospectus stated that Cosi "intend[ed] to continue to expend significant financial and management resources on the development of additional restaurants." (Id. at 8.) The Prospectus also stated that the new restaurants planned for 2002 and 2003 might require additional financing. (Id. at 2-3, 22, 36.) The Prospectus estimated that future restaurants would require, on

4

average, an investment of approximately $650,000 per restaurant, which Cosi expected to fund principally through the IPO. (Id. at 30.) The Prospectus stated that management had "broad discretion as to the use of the net proceeds" from the IPO. (Id. at 12.)

The Prospectus contained more than five pages of risk factors. (Id. at 7-13.) It warned that, "Any inability to implement our growth strategy could materially adversely effect our business, financial condition, operation results or cash flows." (Id. at 7.) It stated that Cosi's ability to expand would "depend on a number of factors, some of which are beyond [Cosi's] control," including "general economic conditions." (Id. at 7.) The Prospectus noted that Cosi had not made a profit prior to the IPO, and that Cosi had a limited operating history, resulting in "limited information with which to evaluate [Cosi's] business and prospects." (Id. at 8.) The Prospectus warned that, "[a]s a result, forecasts of [Cosi's] future revenues, expenses and operating results may not be as accurate as if we had a longer history of operations and of combined operations." (Id.) The Prospectus noted that Cosi intended to "continue to expend significant financial and management resources on the development of additional restaurants" but that Cosi could not predict whether it would be able to achieve or sustain revenue growth, profitability, or

5

positive cash flow in the future. (Id.) The Prospectus stated that Cosi might need additional capital in the future to, among other things, fund its operations, expand its range of services, and finance future acquisitions and investments, and warned that additional capital might not be available on acceptable terms and, if Cosi were unable to raise additional capital, its growth could be impeded. (Id. at 9.)

Cosi's IPO closed on November 21, 2002. (TAC ¶ 40.) Due to demand that was weaker than anticipated, the IPO price was reduced from $8-$10 per share to $7 per share. (Id.) The Prospectus offered 5,555,556 shares, yielding approximately $33 million. (Id.)

On February 3, 2003, Cosi made a series of announcements regarding changes in the corporation. Cosi announced that the board of directors (the "board") and Chairman and Chief Executive Officer ("CEO") Andy Stenzler ("Stenzler") had mutually agreed that Stenzler would resign effective immediately, that leadership would be transferred to Jay Wainwright ("Wainwright"), who would replace Stenzler as CEO, and that Eric Gleacher ("Gleacher") would replace Stenzler as Chairman. (Id. ¶ 48.) During an investor conference phone call described in the TAC, Cosi also made the following announcement:

> Since our IPO, the management team and the board has been carefully evaluating our growth objectives and what the best strategies would be to achieve those objectives. With

the continuing deterioration and uncertainty in the capital markets combined with the complexities of executing a rapid growth plan with a finite amount of capital, the board of directors, with the assistance of management, determined to alter our growth strategy.

(Transcript of conference call held Feb. 3, 2003 ("Tr. Call"), attached at Ex. E to Seidel Decl., at 2.)

In a February 3, 2003 press release, Cosi announced that, "[a]fter considerable analysis of our market opportunity, cost of capital and the significant level of third party interest in franchising the Cosi concept," Cosi had decided to undertake a strategy of franchising. (TAC ¶ 49.) In the February 3 investor conference call, Wainwright explained that, "as we've researched franchising over the last five months or so, we've identified the systems and infrastructure that we need here to support franchising." (Tr. Call at 5.) Wainwright attributed this change to Cosi's lack of sufficient capital to carry out the business plan described in the Prospectus. (TAC ¶ 50.) Wainwright also announced that Cosi would be able to open approximately ten new restaurants in 2003, as opposed to the fifty-three to fifty-nine planned in the Prospectus. (Id. ¶ 50.) Cosi announced that it intended to dismiss twenty-seven percent of its personnel and to take a $1.7 million charge to account for severance and related costs in the first quarter of 2003. (Id.)

7

Following the February 3, 2003 announcements, Cosi's stock price dropped thirty-one percent to $3.10, and continued its descent thereafter. (Id. ¶ 59.) As of the date of the filing of this action, Cosi's common stock was trading as low as $2.63 per share. (Id.)

The plaintiffs bring this action against Cosi, Blair, and various individuals who served as officers or directors at all relevant times, including Stenzler, Wainwright, Gleacher, Nick Marsh, Kenneth S. Buteker, Terry Diamond, Creed L. Ford III, Ian McKinnon, Jeffrey M. Stork, and Greg Wooley, (collectively, the "individual defendants"). The plaintiffs bring the first cause of action against all defendants for violation of § 11 of the Securities Act,[2] alleging that the Prospectus was materially

---

[2] Section 11 of the Securities Act provides, in relevant part:
a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;
(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with

8

misleading in its stated goal of expansion through new stores and its omission of the fact that Cosi had been researching the possibility of pursuing a franchising model. (Id. ¶¶ 60-71.) The plaintiffs bring the second cause of action against Cosi, Stenzler, and Blair for violation of § 12(a)(2) of the Securities Act,[3] alleging that Cosi, Stenzler, and Blair sold

---

   respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
   (5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.
15 U.S.C. § 77k(a).

[3] Section 12(a) provides that,
"(a) In general
Any person who –

   (1) offers or sells a security in violation of section 77e of this title, or
   (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."
15 U.S.C. § 77l(a).

shares by means of a prospectus that was misleading and omitted material facts. (Id. ¶¶ 72-79.) The plaintiffs bring the third cause of action against the individual defendants for violation of § 15 of the Securities Act,[4] alleging that, because of their ownership of Cosi's voting securities and their power to exercise a controlling influence over its management or policies, they are liable for Cosi's violation of §§ 11 and 12(a)(2). (Id. ¶ 80-83.)[5]

### III.
### A.

The defendants argue that the first and second causes of action must be dismissed because the plaintiffs have not alleged that the Prospectus contained a material omission that the defendants had a duty to disclose. Section 11(a) of the

---

[4] Section 15 provides that, "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

[5] This is the plaintiffs' third amended complaint. The plaintiffs have dropped previous allegations that the defendants misled investors about Cosi's ability to pursue the expansion plans in the Prospectus and have raised the new claim that the failure to disclose the possibility of pursuing a franchising model was the allegedly material non-disclosure. (See TAC; Second Amended Complaint filed August 27, 2003; Consolidated Amended Complaint filed July 7, 2003; Class Action Complaint filed Feb. 5, 2003.) The plaintiffs have also disclaimed any effort to plead fraud. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Third Amended Consolidated Complaint, filed Nov. 19, 2004, at 16-18.)

10

Securities Act provides that any signatory to a registration statement, director of the issuer, or underwriter may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading…." 15 U.S.C. § 77k(a). Section 12(a)(2) of the Act imposes liability for selling or offering securities by using a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances in which they were made, not misleading…." 15 U.S.C. § 77l(a)(2). Materiality is thus a required element for claims under both § 11 and § 12(a)(2). Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 57-58 (2d Cir. 1996; I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir. 1991); Steinberg v. PRT Group, 88 F.Supp.2d 294, 299-300 (S.D.N.Y. 2000); see also, In re Opus360 Corp. Sec. Litig., No. 01 Civ. 2938, 2002 WL 31190157, at *4 (S.D.N.Y. Oct. 2, 2002).

A misrepresentation or omission in a prospectus is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) ("[T]here must

11

be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996); see also Opus360, 2002 WL 31190157, at *4.

Generally, materiality is a mixed question of law and fact ordinarily left to the finder of fact to determine. TSC, 426 U.S. at 450. The question of materiality may be decided as a matter of law on a motion to dismiss if the alleged omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." Feinman, 84 F.3d at 540-41 (citations omitted). "The central inquiry in determining whether a prospectus is materially misleading ... is therefore whether defendants' misrepresentations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." I. Meyer Pincus, 936 F.2d at 761 (quotations omitted) (second alteration in original); see also, Opus360, 2002 WL 31190157, at *4.

Moreover, when the omitted information concerns a contingent or speculative event, "the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the

event in light of the totality of the company activity." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks and citations omitted); In re Alliance Pharmaceutical Corp. Sec. Litig., 279 F.Supp.2d 171, 196 (S.D.N.Y. 2003).

Here, the plaintiffs do not allege facts that would establish that mere research into the possibility of pursuing a franchising model would be an event of significant importance to potential Cosi investors. The possibility of franchising, according to the plaintiffs' allegations, was still remote at the time the Prospectus was issued. In the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Third Amended Consolidated Complaint (the "Opposition Memorandum"), the plaintiffs, in responding to the defendants' argument that the TAC alleges fraud and therefore must comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, make clear that they are not alleging that "Cosi stated that it was pursuing one business plan while intending to or actively taking affirmative steps to pursue another." (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Third Amended Consolidated Complaint, filed Nov. 19, 2004 ("Opp. Mem.") at 17 (quoting the Memorandum of Law of the Cosi Defendants in Support of Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action

13

Complaint, filed Oct. 12, 2004 ("Def. Mem.") at 18).) The plaintiffs claim that they "simply allege that Defendants' serious consideration of the alternate franchising model (which was obviously well beyond a passing fancy given that it had already been contemplated for two months), a model which represented a significant departure from the growth strategy depicted in the Prospectus, required disclosure." (Opp. Mem. at 17.) The only facts the plaintiffs offer to support this allegation is Wainwright's February 3, 2003 statement that Cosi had been researching franchising models for five months. (TAC ¶ 49; Tr. Call at 5.) Thus, the plaintiffs allege only that Cosi had researched the possibility of franchising for two months before the Prospectus was issued, and do not allege that a franchising plan had been submitted to or approved by the board, or that any affirmative steps had been taken to implement a franchising plan. Indeed, the plaintiffs conceded at the argument of these motions that the only factual basis for their allegations was the February 3, 2003 investor call and that call supports nothing more than an allegation that Cosi had begun to research the possibility of franchising prior to the IPO. (Transcript of proceedings held July 15, 2005, at 26-28.)

These allegations are insufficient to survive a motion to dismiss. To find that the defendants had a duty to disclose the research of every potential strategy that was merely "well

beyond a passing fancy" (Opp. Mem. at 17) would be inconsistent with the teaching of the Court of Appeals for the Second Circuit. The Court of Appeals has held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993). However, the plaintiffs' own allegations and the conceded factual basis for them do not rise to the level of "active and serious consideration."

Moreover, the Court of Appeals has declined to find a duty to disclose a major marketing plan, even when coupled with test marketing. See San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., 75 F.3d 801, 809 (2d Cir. 1996) (finding that test marketing product at lower price level to gain more market share, even though approved by board of directors, despite announced plans to focus on profits rather than market share, did not create duty to disclose research). This is because "[c]ompanies conduct many experiments and tests in connection with their products, and to require the public announcement of each one would risk 'bury[ing] the shareholders in an avalanche of trivial information.'" Id. (quoting TSC Indus., 426 U.S. at 448).

15

The allegations of active consideration and affirmative steps were far more extensive in San Leandro than in this case. While there was board approval and test marketing for the major marketing plan in San Leandro, there are no factual allegations to indicate that the possibility of a franchising plan had advanced beyond the stage of mere research in this case, and the plaintiffs have disclaimed that they were asserting that Cosi intended or was taking active steps to pursue a business plan different from the plan in the Prospectus. Here, to require the disclosure of the mere research of a potential business plan without any factual allegation that Cosi intended or had taken affirmative steps to implement the plan would be inconsistent with San Leandro.

Although the plaintiffs cite Kronfeld v. Trans World Airlines, Inc. to support their argument that the omission was material, Kronfeld is distinguishable from this case. See Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726 (2d Cir. 1987). In Kronfeld, the magnitude of the potential event was of enormous significance, because it involved the separation of a subsidiary corporation from its parent, which guaranteed much of the credit upon which the subsidiary did business, and which financed the subsidiary's substantial requirements for operating capital. See Kronfeld, 832 F.2d at 735-36. It was undisputed that the nature of the relationship between the parent and

16

subsidiary was "critical to the decisions faced by knowledgeable investors in evaluating [the subsidiary's] value as an investment." Id. Furthermore, the defendant corporation in Kronfeld had retained the investment banking firm Goldman Sachs & Co. to formulate alternatives for the parent and subsidiary corporations, including a separation of the subsidiary corporation from its parent. Id. at 728-30. Thus the Kronfeld opinion concerned a situation in which the magnitude of the potential event was much greater, and in which the event had been under more active consideration by the corporation.

For the reasons explained above, because the plaintiffs have not alleged facts sufficient to demonstrate that the Prospectus was materially misleading, the first and second causes of action are dismissed.

B.

The defendants argue that, in addition to the reasons stated above, the second cause of action must be dismissed because the named plaintiffs lack standing to maintain claims under § 12(a)(2) of the Securities Act.

Section 12(a)(2) grants buyers a right of action against sellers who make material misstatements or omissions "by means of a prospectus." 15 U.S.C. § 77l(a)(2). In Gustafson v. Alloyd Co., Inc., the Supreme Court found that the word

"prospectus" in this context is "a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder," and that a private sales contract did not fall within that definition. Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578, 584 (1995). The Court also indicated that a § 12(a)(2) claim may only be maintained by a purchaser who purchased stock in the public offering at issue rather than in a secondary market transaction. Id. at 578.

The defendants argue that, under Gustafson, only purchasers in an initial public offering have standing and that, because the named plaintiffs have not alleged that they purchased securities in the IPO, they lack standing to bring a claim under § 12(a)(2) based on the IPO. See In re WorldCom Sec. Litig., Nos. 02 Civ. 3288, 03 Civ. 9499, 2004 WL 1435356, at *4-*5 (S.D.N.Y. June 28, 2004); In re Sterling Foster & Co., Inc., Sec. Litig., 222 F.Supp.2d 216, 244-45 (E.D.N.Y. 2002); In re Ultrafem Inc. Sec. Litig., 91 F.Supp.2d 678, 693-94 (S.D.N.Y. 2000). The plaintiffs respond that, although the named plaintiffs do not allege that they bought their shares in the IPO, the allegation that they bought their shares "pursuant to or traceable to" the Prospectus is sufficient to state a claim under § 12(a)(2). See Schoenhaut v. American Sensors, 986 F.Supp. 785, 789-90 (S.D.N.Y. 1997); In re U.S.A. Classic Sec.

Litig., No. 93 Civ. 6667, 1995 WL 363841, at *3 (S.D.N.Y. June 19, 1995).

Well reasoned opinions in this Circuit after Gustafson have rejected the plaintiffs' argument and interpreted Gustafson to preclude purchasers in private or secondary transactions from bringing actions pursuant to § 12(a)(2) based on those purchases. See Worldcom, 2004 WL 1435356, at *5 (noting § 12(a)(2) applies to purchases made in public offering only); Sterling Foster, 222 F.Supp.2d at 244-45 (collecting cases); Ultrafem Inc., 91 F.Supp.2d at 693-94 (finding claim based on purchase made "pursuant to the Offering, i.e., in the Offering" could be brought under § 12, as opposed to purchases made "pursuant or traceable to" offering). For the reasons explained in these opinions, because the plaintiffs have not alleged that they purchased their shares in the IPO, they have failed to allege that they have standing to bring a claim under § 12(a)(2).

Therefore, in addition to the reasons stated above, the plaintiffs' second cause of action is dismissed because the plaintiffs have not alleged facts sufficient to establish standing to bring a claim under § 12(a)(2) of the Securities Act.

C.

The plaintiffs' third cause of action must also be dismissed because the plaintiffs have not alleged an underlying primary violation of the Securities Act. Control person liability under § 15 of the Securities Act is predicated on a primary violation of the Securities Act. See Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004). Because the plaintiffs have failed to state a claim for any primary violation, the plaintiffs' secondary claim must be dismissed. See id.

## CONCLUSION

For the reasons explained above, the plaintiffs' third amended complaint is dismissed in its entirety.[6] The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:** New York, New York
July 27, 2005

John G. Koeltl
United States District Judge

---

[6] Because the Court dismisses all claims asserted against the defendants, it is unnecessary for the Court to reach the defendants' additional arguments in support of their motions to dismiss. Because this is the Third Amended Complaint, the plaintiffs have not sought leave to file another amended complaint.